**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | | |
|---|---|---|
| PHILLIP DERRICK HAMPTON and TRAVIS HAMPTON, | ) ) ) | |
| Plaintiffs, | ) ) | No. 9:17-cv-03374-DCN |
| vs. | ) ) | **ORDER** |
| FIRST PROTECTIVE INSURANCE d/b/a FRONTLINE HOMEOWNERS INSURANCE, and SELECTIVE INSURANCE COMPANY OF THE SOUTHEAST, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on defendant Selective Insurance Company of the

Southeast's ("Selective") motion for partial summary judgment, ECF No. 43, and

plaintiffs Phillip Derrick Hampton and Travis Hampton's (collectively, "plaintiffs")

motion for summary judgment, ECF No. 45. For the reasons set forth below, the court

grants in part and denies in part the motions.

## I.  BACKGROUND

This insurance coverage dispute arises out of the damage Hurricane Matthew

wrought throughout the Southeastern United States in October 2016. The following facts

are taken from the parties' joint stipulation of facts and are thus undisputed. See ECF

No. 44. Plaintiffs are the owners of a beachfront property located at 130 Harbor Drive

North on St. Helena Island, South Carolina. At the time Hurricane Matthew made

landfall, plaintiffs maintained a residence on the property that was elevated on pilings

("the Residence"). The Residence consisted of an elevated first floor, an elevated second

1

floor, and an open-air ground floor, which included a carport resting on a concrete slab, an enclosed storage area, and a staircase. The property also included a boardwalk that led from the Residence to the beach.

Plaintiffs purchased a Standard Flood Insurance Policy ("the Policy") through Selective for the period of January 22, 2016 through January 22, 2017. In their complaint, plaintiffs allege that on October 8, 2016, high winds, rain, and storm surge from Hurricane Matthew caused substantial damage to the Residence. On October 11, 2016, plaintiffs notified Selective that the Residence had suffered flood-related damage. Upon Selective's request, on October 20, 2016, Christopher Felder of CNC Resource ("CNC"), an independent adjusting firm, inspected the Residence and submitted a report to Selective estimating that the damage covered under the Policy would cost $28,681.32 to repair (the "CNC Report"). After application of the $5,000 deductible due upon a claim of building damage under the Policy, the CNC report recommended a $23,681.32 payout.

Plaintiffs hired Principal Claims Group ("PCG"), a public adjusting firm, to assess the damage of the Residence, and on November 2, 2016, PCG published a report (the "First PCG Report"), which estimated damages of $738,707.07 based upon PCG's finding that the Residence was a total loss. On February 2, 2017, plaintiffs submitted a proof of loss to Selective claiming building damage in the amount of $738,707.07 based on the Frist PCG Report. On March 10, 2017, PCG prepared a second report for plaintiffs (the "Second PCG Report"). Where the First PCG Report estimated the total damage to the Residence, the Second PCG Report honed in on flood-related damage to the dwelling area of the Residence, i.e., damage which PCG believed was covered under

the Policy.  The Second PCG Report estimated a total of $47,139.72 of flood-related

damage to the Residence, not including personal property.  The Second PCG Report did

not apply the $5,000 deductible due under the Policy upon a claim of building damage,

which would have reduced its estimate to $42,139.72.

Selective accepted the findings of the CNC Report and, on March 16, 2017,

issued payment to plaintiffs in the amount of $23,681.32.  Selective denied plaintiffs'

remaining claims.  On April 18, 2017, Keith Shaffer, plaintiffs' contractor, prepared an

additional report on behalf of plaintiffs, which opined that the Second PCG Report failed

to take into account additional needed repairs to the Residence that would cost an

additional $94,547.00 (the "Shaffer Report").  After Hurricane Matthew, the South

Carolina Department of Health and Environmental Control ("SCDHEC") determined that

the Residence was located on an active beach.  Because S.C. Code Ann. § 48-39-290

prohibits repair or replacement of a home located on an active beach, plaintiffs had the

Residence transported to a different property that they owned on Harbor Island in the

spring of 2017.  The cost of moving the Residence exceeded $30,000.  On March 8,

2019, plaintiffs filed a proof of loss with Selective seeking "Increased Cost of

Compliance" ("ICC") benefits under the Policy, based on their transportation of the

Residence.  ICC benefits are capped at $30,000 under the Policy.  On March 25, 2019,

Selective denied plaintiffs' ICC claim in its entirety.

On December 14, 2017, plaintiffs filed this action against Selective, bringing a

claim for breach of contract and seeking a declaratory judgment that they are due "total

loss" damages under the Policy.[1]  ECF No. 1.  On February 17, 2020, Selective filed a

motion for partial summary judgment.  ECF No. 43.  On March 13, 2020, plaintiffs

responded in opposition to the motion, ECF No. 48, and on March 20, 2020, Selective

replied, ECF No. 51.  On February 17, 2020, plaintiffs filed a cross-motion for summary

judgment.  ECF No. 45.  On March 13, 2020, Selective filed a response to the motion,

ECF No. 49, and on March 20, 2020, plaintiffs filed a reply, ECF No. 50.  The court held

a hearing on the matter on May 4, 2020.  As such, the motions are now ripe for the

court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine dispute as to

any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  Rule 56(c) of the Federal Rules of Civil Procedure requires that the district

court enter judgment against a party who, "'after adequate time for discovery . . . fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial.'"  Stone v. Liberty

Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986)).  "[T]his standard provides that the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no genuine issue of

material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only

---

[1] The complaint also asserts a claim for bad faith against First Protective
Insurance.  However, plaintiffs have since stipulated to the dismissal of First Protective
Insurance, and as a result their bad faith claim is moot.

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

Any reasonable inferences are to be drawn in favor of the nonmoving party. Anderson, 477 U.S. at 255, Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the fact finder could reasonably decide in his favor, then summary judgment shall be entered "regardless

of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

## III.  DISCUSSION

This dispute involves three different types of coverage included in the Policy: (1) Coverage A—Building Property ("Building Property coverage"), (2) Coverage D—Increased Cost of Compliance ("ICC coverage"), and (3) Coverage C – Personal Property ("Personal Property coverage").  With respect to Building Property coverage, plaintiffs contend that they are entitled to benefits equivalent to the Residence's full value because Hurricane Matthew rendered the Residence a "total loss" under the Policy.  In the alternative, plaintiffs argue that they are entitled to $136,686.72 of Building Property coverage for damage to the Residence.  According to plaintiffs, "This number is [the sum of] $47,139.72 [the value of the damage estimated in the Second PCG Report] and $94,547.00 [the value of additional damage estimated in the Shaffer Report] . . . minus the $5,000.00 deductible."  ECF No. 45 at 5.  In response, Selective argues that the damages included in the Shaffer Report do not receive Building Property coverage under the Policy as a matter of law.

With respect to ICC coverage, plaintiffs argue that they are entitled to $30,000, the full amount of ICC coverage available under the Policy, because they transported the Residence in compliance with SCDHEC's flood management plan, the Residence is eligible for ICC coverage, and the cost to move the Residence exceeded $30,000.  In response, Selective argues that the Residence is not eligible for ICC coverage because the cost to repair the damage from Hurricane Matthew does not equal or exceed 50% of the Residence's pre-flood market value, as required under the Policy.  The parties also

6

dispute whether plaintiffs are entitled to coverage for damage to their personal property, under the Policy's Personal Property coverage. The court addresses each area of coverage in turn. However, before the court turns to the substance of the Policy, it finds worthwhile a general discussion of Standard Flood Insurance Plans.

### A. Standard Flood Insurance Plans

The Policy is a unique type of standardized insurance policy known as a Standard Flood Insurance Plan ("SFIP"). SFIPs are issued through the National Flood Insurance Program ("NFIP"), which Congress created through the National Flood Insurance Act of 1968, 42 U.S.C. § 4001 et seq., because "private insurance companies were unable to write flood insurance policies on an economically feasible basis and something had to be done to alleviate some of the extreme hardships suffered by flood victims." Quesada v. Director, Federal Emergency Management Agency, 753 F.2d 1011, 1014 (11th Cir. 1985) (Tjoflat, J., dissenting).

"Under the [NFIP], flood insurance is sold to qualified applicants either directly by FEMA [the Federal Emergency Management Agency] or by private insurance companies known as 'write-your-own' (sometimes, 'WYO') companies." Woodson v. Allstate Ins. Co., 855 F.3d 628, 631 (4th Cir. 2017) (citing 44 C.F.R. § 62.23). A private insurance company can participate in the NFIP as "a WYO Company" by entering into an agreement with FEMA under which FEMA authorizes the private insurer to issue an SFIP under its own name and assigns the insurer the responsibility for "the adjustment, settlement, payment and defense of all claims arising from policies of flood insurance it issues under the [NFIP]." 44 C.F.R. § 62.23(d). While the responsibility to administer a SFIP lies with the private write-your-own insurer, "[t]he ultimate responsibility for

paying all claims and related expenses[] rests with FEMA."  Woodson, 855 F.3d at 631 (citing 42 U.S.C. § 4017(a)).

"Premiums collected by WYO Companies, after deducting fees and costs, must be deposited in the National Flood Insurance Fund in the United States Treasury."  Battle v. Seibels Bruce Ins. Co., 288 F.3d 596, 599 (4th Cir. 2002) (citing 42 U.S.C. § 4017(d); 44 C.F.R. § Pt. 62, App. A, Arts. II(E) & VII(B)).  Premiums collected on SFIPs by WYO Companies "do not belong to those companies."  Id. (citing Newton v. Capital Assurance Co., 245 F.3d 1306, 1311 (11th Cir. 2001)).  As such, a claim payout by a WYO Company to an insured under an SFIP is "a direct charge on the United States treasury." Id. (citing 44 C.F.R. § 62.23(f)).  In short, SFIPs are generally issued and administered by a private insurance company "in the place and stead of the Federal Insurance Administrator" and backed by the federal government.  44 C.F.R. § 61.13.

The terms and conditions of an SFIP are standardized and codified in regulations to the National Flood Insurance Act.  See 44 C.F.R. § Pt. 61, App. A(1).  Because SFIPs are highly regulated and subject to the National Flood Insurance Act and the regulations promulgated thereunder, "federal law expressly preempts state law with respect to policy interpretation and claims handling in the flood insurance context."  Davis v. Nationwide Mut. Fire Ins. Co., 783 F. Supp. 2d 825, 832 (E.D. Va. 2011) (citing 44 C.F.R. § Pt. 61, App. A(1), Art. IX ("This policy and all disputes arising from the handling of any claim under the policy are governed exclusively by the flood insurance regulations issued by FEMA, the National Flood Insurance Act, and Federal common law.")).  As such, in interpreting the terms of an SFIP, courts employ federal common law, which "draw[s] upon standard principles of insurance law."  Studio Frames Ltd. v. Standard Fire Ins. Co.,

483 F.3d 239, 244 (4th Cir. 2007). Two such cornerstones of insurance law are that (1) a court is to interpret unambiguous policy language according to its plain meaning, and (2) where disputed policy language is ambiguous or susceptible to different constructions, a court is to adopt the construction most favorable to the insured. Id. Of course, a court may "not torture language to create ambiguities." Id.

At the heart of this dispute is the narrow divide between Building Property coverage and ICC coverage under an SFIP. In their own ways, the parties attempt to blur that divide. Plaintiffs seek the benefits available under Building Property coverage for a loss contemplated by ICC coverage, and Selective attempts to apply to ICC coverage limitations that are solely applicable to Building Property coverage. While Congress created both avenues of coverage to insure against flood-related losses under the umbrella of the SFIP, Building Property coverage and ICC coverage have distinct requirements and serve distinct purposes. This case provides an elucidating example of how the particular requirements of each area of coverage operate to serve each's broader purpose.

**B.  Coverage A – Building Property**

In its motion for summary judgment, Selective first argues that "plaintiffs' $94,457 estimate from [the Shaffer Report] is not covered under the terms of [the Policy]." ECF No. 43 at 13. The court takes this argument to mean that the damages included in the Shaffer report are not covered under the Policy as a matter of law. To recap, the Shaffer Report contains an estimate of $94,457.00 in damages that plaintiffs' contractor, Keith Shaffer, believes should have been, but was not, reflected in the Second PCG Report. Selective directs its arguments on summary judgment to the damages

contained in Shaffer's report, i.e., the damages plaintiffs claim in excess of the Second PCG Report's estimate of damages in the amount of $42,139.72.

In support of its legal conclusion, Selective asserts two arguments. First, Selective argues that Shaffer's entire report is premised upon damage to the soil under the Residence and that the Policy does not cover damage to soil unless that damage affects the foundation of the insured's dwelling. And here, Selective argues, the soil damage is not covered by under the Policy because "[t]here was no flood-related damage to the foundation pilings that supported the [Residence]." ECF No 43 at 13. Second, Selective argues that specific items included in the Shaffer Report are not covered under the Policy as a matter of law under the Policy's "lowest elevated floor" limitation. In response, plaintiffs argue that the damage to the soil is covered under the Policy, and that the Residence is a "total loss" because Hurricane Matthew changed the topography of the beach, such that the Residence after the storm was located on an active beach. The court addresses each in turn.

### 1. Damage to the Soil

Selective argues that the damages contained in the Shaffer report are not covered under the Policy as a matter of law because the Policy does not cover damage to soil. In response, plaintiffs argue that the damage to the soil in this case is covered under the Policy because it constitutes foundational damage to the dwelling. Because this disputed issue depends on fact rather than law, the court finds summary judgment inappropriate here.

Coverage A, the Building Property coverage section of the Policy, states that Selective "insure[s] against direct physical loss by or from flood to . . . [t]he dwelling at

the described location . . . ."  ECF No. 44-1 at 5; 44 C.F.R. § Pt. 61, App. A(1), Art.

III(A).  Unlike a typical homeowner's insurance policy, an SFIP "is not a valued policy,"

meaning that it is not a "policy in which the insured and the insurer agree on the value of

the property insured, that value being payable in the event of a total loss."  44 C.F.R. § Pt.

61, App. A(1), Art. II(B)(28).  Instead, an SFIP covers only "[d]irect physical loss by or

from flood" which is defined by the Policy: "Loss or damage to insured property, directly

caused by a flood.  There must be evidence of physical changes to the property."  ECF

No. 44-1 at 4; 44 C.F.R. § Pt. 61, App. A(1), Art. II(B).  The Policy defines "dwelling"

consistent with its common meaning, as "[a] building designed for use as a residence . . ."

Id.  Thus, for a loss to receive Building Property coverage, it must be (1) direct physical

loss caused by flood (2) to the dwelling.

> If an insured is entitled to coverage for flood-related damages, the United States:
>
> will pay to repair or replace the damaged dwelling after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:
>
> (1) The building limit of liability shown on your Declarations Page;
>
> (2) The replacement cost of that part of the dwelling damaged, with materials of like kind and quality and for like use; or
>
> (3) The necessary amount actually spent to repair or replace the damaged part of the dwelling for like use.

ECF No. 44-1 at 25; 44 C.F.R. § Pt. 61, App. A(1), Art. V(2).  Relevant here, the loss

settlement section also states, "If the dwelling is rebuilt at a new location, the cost

described above is limited to the cost that would have been incurred if the dwelling had

been rebuilt at its former location."  Id.

Selective argues that the Shaffer Report "is based entirely on the notion that 'the entire dirt under the entire building has been removed or stressed to the point that all ground under entire house [sic] is unstable since soil was disturbed by the storm surge.'" ECF No. 43 at 13 (citing ECF No. 44-6, the Shaffer Report, at 1). Such damage, Selective argues, is not covered under the Policy because the Policy "does not cover the cost to tamp, test[,] and treat soil to bring it back to its original specifications." Id. at 14.[2] Selective is correct that the Policy provides coverage for damage to a dwelling and not damage to soil. See ECF No. 44-1 at 5; 44 C.F.R. § Pt. 61, App. A(1), Art. III(A) (extending coverage to physical loss to "the dwelling."). However, damage to soil can constitute damage to a dwelling where the soil is so severely damaged that the dwelling's foundational integrity is affected. In other words, the Policy does not cover damage to soil itself; however, it does cover structural damage to a dwelling.

Selective argues that "[t]here was no flood-related damage to the foundation pilings that supported the [Residence]. ECF No 43 at 13. In support of that contention, Selective relies on the CNC Report and the Second PCG Report, both of which determined that that flood-related erosion could be repaired through the addition of 40

_____

[2] In its motion, Selective also discusses an "earth movement" exclusion to the Policy, which excludes from coverage "loss to property caused directly by earth movement . . . ." ECF No. 44-1 at 15; 44 C.F.R. § Pt. 61, App. A(1), Art. V(C). However, as Selective also notes in its motion, the earth movement exclusion does not apply to "losses from [] land subsidence as a result of erosion that are specifically covered under [the Policy's] definition of flood." Id. Selective does not dispute that the subsidence of soil under the Residence was the result of a "flood" as that word is defined in the Policy. Moreover, the exclusion refers back to the relevant coverage provision for a determination of whether coverage exists. In other words, the exclusion has no effect on flood-related damage to a dwelling, which is governed by Coverage A - Building Property Coverage. Therefore, the court is unsure why Selective calls the court's attention to this exclusion, and, to the extent that Selective argues that this exclusion applies here, the court rejects that argument.

cubic yards of replacement sand.  The amount that Selective paid out to plaintiffs included the cost of this replacement sand.  Aside from the damage repaired by the replacement sand, Selective argues, "there was no structural damage to the [Residence]'s foundation or other covered loss relating to any flood-related erosion."  Id. at 15. Plaintiffs, on the other hand, have presented evidence that the damage to the soil amounted to structural damage to the Residence and was not repaired by the mere addition of replacement sand.

Plaintiffs have presented a "damage evaluation", prepared by Eduard Badiu ("Badiu") of PCG, in which Badiu opines,

> In this case, there was a significant amount of water that penetrated areas of the environment that have complex surfaces and are difficult to restore. Since there are serious concerns with the <u>significant structural damages of the components of the building, it is in our opinion that the subject building has sustained surge damage, and extensive wind, water damage</u> . . . .

ECF No. 48-1 at 6 (emphasis added).  Additionally, the Shaffer Report concludes that Hurricane Matthew caused significant damage to the foundation of the Residence and that the foundation requires extensive repair.  See ECF No. 44-6, Shaffer Report ("The first item to realize is that the entire dirt under the entire building has been removed or stressed to the point that all ground under entire house is unstable since soil was disturbed by the storm surge.").

The determination of whether damage to the soil under the Residence is covered under the Policy depends on whether the damage is merely to the soil itself or whether the damage to the soil results in structural damage to the Residence, i.e., damage to the Residence's foundation.  If the damage is merely to the soil, then plaintiffs are not entitled to Building Property coverage.  If the damage to the soil causes structural

damage, then the plaintiffs are entitled to "the cost that would have been incurred if the dwelling had been rebuilt at its former location."  ECF No. 44-1 at 25; 44 C.F.R. § Pt. 61, App. A(1), Art. V(2).  Because this issue rests on disputed fact, summary judgment is inappropriate.

### 2.  Specific Itemized Damages in the Shaffer Report

Selective argues that "multiple items in Shaffer's estimate are not covered under [the Policy]" because they are not listed in Section III(A)(8), which specifically limits coverage for items below the lowest elevated floor.  The court agrees in part.

Discussed above, if plaintiffs are entitled to Building Property coverage under the Policy, such coverage is limited to "the cost that would have been incurred if the dwelling had been rebuilt at its former location."  ECF No. 44-1 at 25; 44 C.F.R. § Pt. 61, App. A(1), Art. V(2).  Thus, if the damage to the soil under the Residence constituted structural damage, plaintiffs are entitled to the cost to repair said structural damage, despite the fact that such damage will never actually be repaired because plaintiffs have transported the Residence.  The Policy further limits Building Property coverage for "items of property in a building enclosure below the lowest elevated floor."  ECF No. 44-1 at 6; 44 C.F.R. § Pt. 61, App. A(1), Art. III(A)(8).  Such coverage is limited to seventeen items of specifically listed property (for example, "central air conditioners").  Id.

The Shaffer Report opines that replacing and re-tamping the soil is necessary to repair structural damage to the Residence and that to do so, several items of property in the open-air ground floor will need to be removed and replaced.  It is undisputed that many of the items that will need to be removed and replaced are not listed in the Policy as

14

covered items.  Thus, the court must reconcile two provisions of the Policy.  On one hand, the Policy states that if the insured is entitled to coverage, the United States will pay out "the cost that would have been incurred if the dwelling had been rebuilt."  On the other hand, the Policy specifically excludes coverage for most items located below the first elevated floor.  The court finds that these two provisions are not antagonistic.  The Policy simultaneously provides Building Property coverage for the cost to repair structural damage, but does not include coverage for the cost to replace certain items of property located below the first elevated floor.  Thus, plaintiffs may be entitled to coverage for the cost to remove specific items of property, so that the underlying soil can be re-tamped and the structural damage repaired; however, plaintiffs are not entitled to recover the cost of repairing or replacing such items based on the damage they incurred during flooding from Hurricane Matthew.

To the extent that the Shaffer Report includes the costs of removing items for the purpose of re-tamping the underlying soil, the court finds that whether plaintiffs are entitled to coverage therefor depends on whether the damage to the soil constitutes structural damage to the Residence.  As such, summary judgment with respect to those damages is denied.  However, to the extent that the Shaffer Report includes as estimated damages the cost to repair or replace items that are located below the first elevated floor and that are not specifically covered under Article III, Section (A)(8) of the Policy, the court finds that the Policy does not provide coverage for such damages as a matter of law.[3]

---

[3] Plaintiffs, in their response to Selective's summary judgment motion, concede that Schaffer's estimates of $2,500 for landscaping damage and $4,000 for damage to the

### 3. "Total Loss" Coverage

In their motion for summary judgment, plaintiffs argue that they "sustained a total loss to the property and are, therefore, entitled to the full amount of insurance under the policy for property damage [under Coverage A]." ECF No. 45 at 2. Specifically, plaintiffs argue that Hurricane Matthew eroded the sand underneath the Residence to the point that it was located on an active beach after the storm. As such, South Carolina law prohibited plaintiffs from using or repairing the Residence. Therefore, plaintiffs conclude, the Residence is a "total loss", and plaintiffs are entitled to full benefits under the Policy's Building Property coverage. The court disagrees, finding that the terms of the Policy reflect Congress's intent for this type of loss to be covered through ICC coverage, not Building Property coverage

Discussed above, Building Property coverage extends only to "direct physical loss by or from flood to . . . [t]he dwelling at the described location . . . ." ECF No. 44-1 at 5; 44 C.F.R. § Pt. 61, App. A(1), Art. III(A). The Policy makes explicitly clear that it is not a "valued policy", meaning it is not a policy "in which the insured and the insurer agree on the value of the property insured, that value being payable in the event of a total loss." 44 C.F.R. § Pt. 61, App. A(1), Art. II(B)(28). By the plain language of the Policy, there is no coverage for plaintiffs' "total loss" because the "total loss" plaintiffs claim is not a "direct physical loss [] from flood."

Plaintiffs claim that Hurricane Matthew:

damaged the framing and foundation of the stairways, walkways and decking such that there was no access to the home. Beyond that, the ground underneath the home was eroded to the point that Plaintiffs' property was

---

beach walkway are not entitled to Building Property coverage. The court agrees that such damages are not covered under the Policy as a matter of law.

located on active beach following the storm and the ground beneath was unstable.

Following the flood, Plaintiffs were unable to access the home (no stairs), reside in and/or use their residence (unsafe), repair their residence, or rebuild their residence on their lot (the lot was gone).    To complicate matters, South Carolina law precluded the repair or replacement of the home since it was located on active beach after the storm.

ECF No. 45 at 3.  Plaintiffs claim that flooding from Hurricane Matthew damaged their property and that South Carolina law prohibited plaintiffs from repairing that damage. Selective has already provided plaintiffs with coverage to the extent that the Residence itself was physically damaged by Hurricane Matthew.[4]  There is no dispute that the flood damage to the Residence itself, without more, did not render the Residence a total loss. Instead, plaintiffs claim that damage to the property, in conjunction with plaintiffs' inability to repair the damage, rendered the Residence a "total loss."  In other words, the direct cause of the "total loss" is not the damage from the flood itself, but the plaintiffs' inability to repair the damage under the law, which forced plaintiffs to transport the Residence to a different property.  This argument is consistent with a legal theory known as the "constructive total loss doctrine."

A constructive total loss "occurs when a building, although still standing, is damaged to the extent that ordinances or regulations in effect at the time of the damage actually prohibit or prevent the building's repair, such that the building has to be demolished [or, it stands to reason, transported]."  Greer v. Owners Ins. Co., 434 F. Supp. 2d 1267, 1279 (N.D. Fla. 2006).  The Fifth Circuit has found that the constructive loss

---

[4] As discussed above, Selective has not provided coverage for damage to the soil, which may or may not constitute damage to the Residence. To the extent that plaintiffs claim other specific flood damage to the Residence, those arguments are resolved in the other subsections of this order.

doctrine does not apply to Building Property coverage under an SFIP. <u>Monistere v. State Farm Fire & Cas. Co.</u>, 559 F.3d 390 (5th Cir. 2009). In <u>Monistere</u>, local laws forced the insureds to rebuild their home at a higher elevation, despite the fact that the underlying flood caused only moderate damage to the dwelling. The district court found that the cost to rebuild the home justified a finding of "total loss" and entitled the insureds to recover the full amount of their Building Property coverage limit. The Fifth Circuit disagreed, finding that "the district court's common sense view did not give sufficient meaning to the regulations that control [the courts]." <u>Id.</u> at 393. The Fifth Circuit found that the SFIP language entitled the insured under Building Property coverage to "the *lesser* of the coverage limit [], the replacement cost of that part of the dwelling damaged [], or the amount actually spent to repair[]." <u>Id.</u> at 393–94 (quoting 44 C.F.R. § Pt. 61, App. A(1), Art. 5(2)(a)). The court agreed with the insured that "the house was effectively a total loss," but concluded that the total loss was the result of "the costs that regulatory authorities imposed for rebuilding," and was not directly caused by physical damage from the flood. <u>Id.</u> In other words, the Fifth Circuit found that an SFIP entitles an insured to Building Property coverage for physical damage to their dwelling directly caused by flooding, but it does not entitle an insured to coverage for indirect damages associated with the costs incurred to comply with local law after a flood. Congress intended that type of regulatory loss, the court noted, to be covered through ICC coverage.

   The court agrees with the logic of the Fifth Circuit. The "total loss" damage that plaintiffs claim is rooted in their inability to repair the Residence. Thus, the fact that the Residence is effectively a "total loss" is the result of South Carolina law, not "direct

physical damage" to the dwelling by flood.  Indeed, district courts in the Fourth Circuit have recognized that an SFIP does not provide Building Property coverage for constructive total losses.  <u>Moffett v. Computer Scis. Corp.</u>, 2011 WL 652853, at *4 (D. Md. Jan. 13, 2011), report and recommendation adopted, 2011 WL 673777 (D. Md. Feb. 17, 2011) ("FEMA has applied a strict construction to the terms of SFIP, and has convinced federal courts not to interfere with their administration by imposing equitable glosses on SFIP or requiring FEMA to adjust claims in the ways that private insurers must do under other regulatory regimens.").  As the Fifth Circuit noted, Congress contemplated the increased cost of complying with local flood-management law through ICC coverage, which the court discusses below.  Therefore, the court finds that plaintiffs are not entitled to Building Property coverage consistent with a "total loss" because the "total loss" claimed was not "directly caused by flood."  As such, plaintiffs' motion for summary judgment with respect to Building Property coverage is denied.

### C.  Coverage D – Increased Cost of Compliance

Plaintiffs argue that they "clearly meet[] the eligibility test" for ICC coverage under the Policy.  ECF No. 45 at 5.  Selective disagrees, arguing that the Residence is not eligible for ICC benefits because cost to repair the residence from flood damage does not equal or exceed 50% of the Residence's value.   The court agrees with plaintiffs.

ICC coverage under the Policy provides:

> This policy pays you to comply with a State or local floodplain management law or ordinance affecting repair or reconstruction of a structure suffering flood damage.  Compliance activities eligible for payment are: elevation, floodproofing, relocation, or demolition (or any combination of these activities) of your structure.
>
> …

> We will pay you up to $30,000 under this Coverage D—Increased Cost of Compliance, which only applies to policies with building coverage (Coverage A). Our payment of claims under Coverage D is in addition to the amount of coverage which you selected on the application and which appears on the Declarations Page. . . .

ECF No. 44-1 at 10–11; 44 C.F.R. § Pt. 61, App. A(1), Art. III(D)(1)–(2). The Policy provides two avenues for ICC eligibility. Under the first, coverage is extended to a relocated or renovated structure that is a "repetitive loss structure." The parties agree that the Residence is not a "repetitive loss structure." Under the second avenue, ICC coverage extends to:

> a structure that has had flood damage in which the cost to repair equals or exceeds 50% of the market value of the structure at the time of the flood. The State or community must have a substantial damage provision in its floodplain management law or ordinance being enforced against the structure.

ECF No. 44-1 at 10–11; 44 C.F.R. § Pt. 61, App. A(1), Art. III(D)(3).

The parties agree that the fair market value of the Residence was $180,000 at the time Hurricane Matthew made landfall. ECF No. 44 at ¶ 23. As such, if the cost to repair the Residence (had the plaintiffs repaired it rather than transported it to another property) would have equaled or exceeded $90,000, plaintiffs are entitled to ICC coverage. Selective contends that plaintiffs cannot show such a cost to repair because a majority of the damage they claim is not covered by Building Property coverage.

> [T]here is no coverage under the SFIP for Shaffer's $94,457 estimate. As a result, Plaintiffs' remaining claim for flood damage to the Property is $47,139 – the cost of PCG's March 10, 2017 estimate. Moreover, to date, Selective has issued payment under the SFIP in the amount of $23,681.32 for covered flood damage to the Property. Whether by Plaintiffs' claim ($47,139) or Selective's payment ($23,681) for flood damage, the cost to repair flood damage to the Property does not equal or exceed $90,000 – 50% of the Property's market value.

20

ECF No. 43 at 21.  Stated more concisely, Selective argues that because certain damages are not covered under the Policy's Building Property coverage, they cannot be factored into the calculation of damages in determining whether plaintiffs are eligible for ICC coverage.  The problem with Selective's argument is it assumes that the phrase "cost to repair [flood damage]" in the ICC provisions means "cost to repair flood damage that receives Building Property coverage."  There is no language in the Policy to support such an assumption.[5]

The plain language of the ICC coverage section is clear.  A structure is entitled to ICC coverage if it "has had flood damage in which the cost to repair equals or exceeds 50% of the market value of the structure."  ECF No. 44-1 at 10–11; 44 C.F.R. § Pt. 61, App. A(1), Art. III(D)(3).  There is no indication that such "flood damage" must receive Building Property coverage.  Conversely, the insuring language under for Building Property coverage, states that it covers only "[d]irect physical loss by or from flood" which is a defined phrase in the Policy.  ECF No. 44-1 at 6; 44 C.F.R. § Pt. 61, App. A(1), Art. III(A).  In other words, while Building Property insures only damage "directly caused by flood", ICC coverage provides insurance where a structure has flood-related damage equal to or exceeding 50%.

---

[5] Selective contends that the damage contemplated by ICC coverage must be damage that is covered under Coverage A – Building Property coverage because the ICC coverage provisions state that coverage extends to "structure covered under Coverage A – Building Property."  ECF No. 44-1 at 10–11; 44 C.F.R. § Pt. 61, App. A(1), Art. III(3).  This provision merely states that a <u>structure</u> must have Building Property coverage to be eligible for ICC coverage.  It does not stand for the requirement that the damage contemplated in the ICC provisions must receive Building Property coverage.  Such an interpretation stretches too thin the plain language of the Policy.

Here, the Residence falls squarely within the requirements for ICC coverage.  It is undisputed that the Residence was damaged—to some extent—by floods from Hurricane Matthew.  It is also undisputed that Hurricane Matthew caused the Residence to be located on an active beach, which prohibited plaintiffs from repairing it under local flood-plain management law.  As a result, plaintiffs experienced a "total loss" of the use and enjoyment of the Residence.  As discussed above, that "total loss" was not "directly caused by flood" such that it receives Building Property coverage.  However, plaintiffs' "total loss" of the Residence is undoubtedly flood-related, such that it receives ICC coverage.  In fact, Congress's purpose in including ICC coverage in the SFIP was to provide insurance for this type of loss, one that is indirectly caused by flood and more directly brought about by the effect of local flood-plain law.  See Monistere, 559 F.3d at 394 (finding that Congress "balanced the equities" by determining that direct flood loss would be insured against through Building Property coverage and regulatory loss would be insured against through ICC coverage).

In sum, the Residence is a "total loss" for the purposes of ICC coverage because after Hurricane Matthew, local flood-plain management law prohibited plaintiffs from repairing it and thus rendered the Residence valueless.  The cost to transport the Residence to another location is a loss insured by ICC coverage, not by Building Property coverage.  Moreover, Building Property coverage's requirement that covered damage be physical loss caused directly by flood does not apply to ICC coverage.  As such, plaintiffs are entitled to ICC coverage, which is capped under the Policy at $30,000.  Therefore, the court grants plaintiffs' motion for summary judgment with respect to their claim for ICC coverage and denies Selective's motion for summary judgment with respect to the same.

22

### D.  Coverage B - Personal Property Coverage

The Policy includes another area of coverage about which the parties disagree: Coverage B – Personal Property.  As the name suggests, Personal Property coverage insures personal property located inside a dwelling "against direct physical loss by or from flood."  ECF No. 44-1 at 7; 44 C.F.R. § Pt. 61, App. A(1), Art. III(B).  Plaintiffs claim that flooding from Hurricane Matthew directly damaged several items of personal property located in the Residence.  Selective claims that the items of personal property were not directly caused by flood because "Plaintiffs' motion fails to establish that flood water entered the [Residence] and that said flood water damaged the claimed personal property items."  ECF No. 49 at 8.  In reply, plaintiffs contend that the claimed personal property was destroyed by "significant amounts of moisture that existed following the storm and Plaintiffs['] inability to access the home to mitigate the moisture issues" due to an inability to access their property for weeks after the storm.  ECF No. 50 at 5.  Thus, the court must determine whether damage from prolonged exposure to moisture during and after a flood constitutes "direct physical loss by or from flood."  The context of the Policy, relevant case law, and common sense lead the court conclude that it does.

The provisions of Coverage B – Personal Property provide little clarity on this issue.  However, the Policy includes a general exclusion that is instructive.  The Policy specifically excludes from coverage "direct physical loss caused directly or indirectly by . . . water, moisture, mildew, or mold damage that results primarily from any condition (a) substantially confined to the dwelling, or (b) that is within your control . . . ."  ECF No. 44-1 at 15; 44 C.F.R. § Pt. 61, App. A(1), Art. V(D).  By negative implication, the Policy indicates that coverage is available for direct physical loss caused by moisture

where the condition is not confined to the dwelling or within the insured's control. Here, the flooding from Hurricane Matthew was certainly neither. Therefore, the context of the Policy leads the court to conclude that damage from moisture during a flood constitutes "direct physical loss by or from flood."

Further, the relevant case law supports the court's conclusion. In Stevens v. Bankers Ins. Co., the Northern District of California considered similar arguments when a retailer made a claim under an SFIP for damaged wallpaper after floodwater "coursed through the town of Napa, and, eventually, poured into plaintiffs' store." 970 F. Supp. 769, 772 (N.D. Cal. 1997). Although waters from the Napa flood never made contact with the wallpaper, "the March heat" and "substantial moisture" from the flood "came to rest on the rolls of wallpaper [and] rendered [them] unsalable." Id. The defendant-insurer argued that a covered loss under an SFIP's Personal Property coverage occurs only where floodwater makes contact with, and thus "directly" damages, personal property. The court rejected the argument "out of hand," finding that the "settled authority, not to mention common sense" compels the conclusion that damage from flood moisture constitutes direct physical loss from a flood. Id. (citing Plywood Property Associates v. Nat'l Flood Ins. Program, 928 F. Supp. 500 (D.N.J. 1996) (allowing claim for damage caused by flood where water did not touch property); Smoak v. Independent Fire Ins. Co., 874 F. Supp. 110 (D.S.C. 1994) (damage incidental to flood water covered); and Gibson v. Sec'y of U. S. Dep't of Hous. & Urban Dev., 479 F. Supp. 3, 5 (M.D. Pa. 1978) (dwelling damaged but not touched by water covered where loss proximately caused by flood)).

Moreover, common sense supports the court's analysis. As any flood victim can attest, flood damage is not confined to water damage, and the provisions of the Policy clearly reflect that reality. It would make little sense to hold that an item perched on a shelf of a flooded room, damaged beyond repair by moisture and salt in the air rather than floodwater, is not covered under an SFIP simply because flood water never reached it. Such a result would both be unjust and make little sense. The court declines to define the phrase "direct flood damage" so narrowly as to exclude all non-water damage from flood. As such, the court finds that the personal property directly damaged by exposure to flood moisture receives Personal Property coverage under the Policy.

However, the court finds that summary judgment is inappropriate on the plaintiffs' claim of $13,091.63 in personal property damage based on the dearth of undisputed evidence before it. In support of their claim, plaintiffs have presented an itemized list of personal property that they allege was damaged by Hurricane Matthew. See ECF No. 43-3. The joint stipulation of facts before the court merely reveals that plaintiffs "claim approximately $13,091.63 in [Personal Property] damages." ECF No. 44 at 5. The court has no evidence before it from which it can conclude that the claimed items were directly damaged by Hurricane Matthew's flooding, even applying the court's interpretation of the Policy's provisions. Moreover, plaintiffs have presented scant evidence as to the value of such items, save for internet links to similar pieces of personal property available for sale online. In short, while the law supports the plaintiffs' claim to Personal Property coverage, the court lacks a sufficient factual basis from which it could grant summary judgment on this issue. Therefore, plaintiffs' motion for summary judgment on the issue of personal property damages is denied.

In sum, after the court's resolution of the instant motions, whether plaintiffs are entitled to damages contained in the Shaffer Report depends on genuine issues of disputed fact and thus proceeds to trial. However, plaintiffs' claim for "total loss" damages under Building Property coverage is resolved on summary judgment in favor of Selective. Plaintiffs' claim under ICC coverage is resolved on summary judgment in favor of plaintiffs, entitling plaintiffs to the full amount of ICC coverage available under the Policy. Finally, whether plaintiffs are entitled to damages under Personal Property coverage depends on genuine issues of material fact and thus proceeds to trial.

## IV. CONCLUSION

For the foregoing reasons the court **GRANTS IN PART** and **DENIES IN PART** Selective's motion and **GRANTS IN PART** and **DENIES IN PART** plaintiffs' motion.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**May 13, 2020**
**Charleston, South Carolina**